## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 12-01093-JW |
| | Chapter 11 |
| Madawaska Hardscape Products, Inc., | **ORDER** |
| Debtor(s). | |

This matter is before the Court on TD Bank, N.A.'s Emergency Motion for Order Prohibiting Use of Cash Collateral, filed on March 29, 2012; TD Bank, N.A.'s Motion for Relief from the Automatic Stay, filed on April 4, 2012; and Madawaska Hardscape Products, Inc.'s Motion for Use of Cash Collateral, filed on April 5, 2012 ("Motions"). Pursuant to Federal Rule of Civil Procedure 52, which is made applicable to this matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c), the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

1.    Madawaska Hardscape Products, Inc. ("Debtor") commenced this case on February 22, 2012 (the "Petition Date") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The petition was signed on behalf of Debtor by its president, Daniel B. Albert.

2.    Debtor is a company engaged in the business of selling hardscaping products, including pavers and other stone products. It operates its business out of two locations: 1) 222 Riverside Street, Portland, Maine ("Maine Location"), and 2) 3146 Wade Hampton Boulevard, Taylors, South Carolina ("South Carolina Location"). Debtor manages both locations from its headquarters in Taylors, South Carolina. The real

---

[1]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are likewise so adopted.

property upon which the businesses are located is not owned by Debtor,[2] and according to Mr. Albert's testimony, are currently in foreclosure. The Maine Location is owned by 222 Riverside Corp. and is leased to Debtor for $2,500 per month.[3]  The South Carolina location is owned by 3146 WHB, LLC and is leased to Debtor for $7,500 per month. However, Mr. Albert testified that no lease payments have been made for either location during the three month period prior to the hearing on the Motions.  According to Debtor's schedules and statement of financial affairs, Mr. Albert is also the principal and owner of 222 Riverside Corp. and 3146 WHB, LLC.

      3.    TD Bank, N.A. ("TD Bank") is a secured creditor of Debtor.  On Schedule D, Debtor listed TD Bank as holding a claim in the amount of $595,795.96, secured by a UCC-1 Lien on a 1995 Mack Truck, Moffett Forklift, two Daewoo Forktrucks, a JCB Loader/Backhoe, inventory and other personal property.  According to the parties, TD Bank has two loans that are at issue in this case: 1) the Madawaska Hardscape Products, Inc. loan ("Madawaska Loan"); and 2) the 222 Riverside Corp. loan ("222 Riverside Loan").

      a.  The Madawaska Loan is a commercial line of credit with a security agreement covering specified items of personal property owned by Debtor.  This loan has three guarantors:  Daniel B. Albert, Keystone Northeast, Inc., and 222 Riverside Corp.  The guaranties executed by Daniel B. Albert and Keystone Northeast, Inc. are unsecured.  The 222

---

[2]      Debtor owns a commercial building at 200 North Watson Road in Taylors, South Carolina.  This property is subject to a mortgage held by Bank of America and is not at issue in these Motions.

[3]      Debtor's statement of financial affairs indicates that lease payments were made to 222 Riverside Corp from January 31, 2011 through February 10, 2012.  The statement further indicates that lease payments to 3146 WHB, LLC were made on January 13, 2011 and February 14, 2011 for the South Carolina location.

Riverside Corp. guaranty is secured by a junior mortgage on the Maine Location. According to the testimony of TD Bank's witness, Teall Gerrett, and the TD Bank Loan Summaries admitted into evidence, the balance owed on the line of credit as of April 24, 2012, is $605,329.87, with a per diem rate of $73.97964.

b. The 222 Riverside Corp. Loan is a promissory note and mortgage executed by 222 Riverside Corp. in favor of TD Bank dated March 31, 2003, in the principal amount of $300,000.00, which is secured by the Maine Location.  This loan also has three guarantors:  Daniel B. Albert, Keystone Northeast, Inc., and Debtor. The guaranties executed by Daniel B. Albert and Keystone Northeast, Inc. are unsecured. Debtor's guaranty is secured by a commercial security agreement executed by Debtor in favor of TD Bank, which covers certain personal property of Debtor. Mr. Gerrett testified that the balance owed on this note is $212,239.16, as of April 24, 2012, with a per diem rate of $24.78226.

4.    The history of Debtor's financing relationship with TD Bank appears to be as follows:

a. On August 29, 2001, Debtor executed a commercial line of credit agreement for the Madawaska Loan with TD Bank in the amount of $100,000.00, secured by a "security agreement respecting personal property, namely (but without limitation); All Business Assets, 1995 Mack Truck... 1998 Daewoo G25 Fork Lift and any other equipment

purchased with loan proceeds" and the guaranties of Mr. Albert,

Keystone Northeast, Inc. and 222 Riverside Corp.

b.  Also on August 29, 2001, Debtor entered into a Security Agreement

with TD Bank securing the obligations set forth in the line of credit

agreement.  The Security Agreement provides (in pertinent part):

> Grant of Security Interest in Collateral.  As security for the
> Secured Obligations described in section 2 hereof, Debtor hereby
> grants to the Secured Party a present and continuing security
> interest in and valid lien on all of the Debtor's property described
> on Exhibit A attached hereto, together with any and all additions
> and accessions thereto, replacements, proceeds (including without
> limitation insurance proceeds) and products thereof, and
> substitutions therefor, wherever the same may be located and
> whether now existing or hereafter arising or acquired (hereinafter
> referred to collectively as the "Collateral"), authorizes Secured
> Party to file financing statements reflecting such grant, and ratifies
> any such financing statements filed prior to the execution of this
> Agreement.

> Special Representations, Warranties and Covenants of Debtor.
> Debtor hereby warrants and covenants to the Secured Party that: ...
> The chief executive office of Debtor and all of Debtor's additional
> places of business, if any, and the location of all the Collateral are
> listed in Exhibit B attached hereto.  Debtor will not change its
> name, organizational number, the jurisdiction of its organization
> and existence, nor chief executive office nor any other place of
> business, nor the location of any collateral, without at least 30
> days' prior written notice to the Secured Party.

Exhibit A to the Security Agreement sets forth a detailed description

of each type of collateral covered by the agreement (collectively,

"Cash Collateral"), including:

> (a)  All of Debtor's goods, accounts, instruments, chattel
> paper, documents, investment property, commercial tort
> claims, letter of credit rights, general intangibles,
> deposit accounts and money (as these terms are define
> in the Maine Uniform Commercial Code) including but
> not limited to the following:

4

      (b) all of Debtor's equipment, including all equipment, machinery, furniture, fixtures, trade fixtures, goods, computer hardware and software, motor vehicles, rolling stock and all other tangible personal property of Debtor other than inventory, any parts or accessions for any of the foregoing, and all documents evidencing Debtor's title to any of the foregoing, all whether now owned or hereafter acquired and wherever located, ...;

      (c) all of Debtor's inventory, whether now owned or hereafter acquired, ...;

      (d) any and all of Debtor's rights to payments for goods sold or leased or for services rendered...;

      (e) all of Debtor's other tangible or intangible personal property of every type or nature not described above...;

      (f) commercial tort claim(s)...;

      (g) other:  1995 Mack Truck, Vin #IM2B212C65M003332, 1998 Daewoo G25 Fork Lift Vin #1208676.

Exhibit B to the Security Agreement provides the place of business and locations of collateral as follows:

    1. Debtor's Chief Executive Office:

       222 Riverside Street, Portland, Maine 04102

    2. Location of all Collateral:

       222 Riverside Street, Portland, Maine 04102

c.  At the time Debtor executed the Security Agreement, Debtor's only location was the Maine Location.  On July 26, 2002, Mr. Albert established a retail store for Debtor in South Carolina.

d.  Beginning on December 30, 2003, Debtor entered into a series of agreements with TD Bank to modify the term and amount of the loan. Agreements changing the term and/or the amount of the loan were executed by Debtor and TD Bank on December 30, 2003; January 12, 2005; December 20, 2005; March 22, 2006; May 18, 2006; August 22,

2006; June 20, 2007; September 20, 2007; October 29, 2007; and November 26, 2008.  Each of the extension agreements provided that the other terms of the commercial line of credit agreement and the Security Agreement remain unchanged and in full force and effect.

e. TD Bank filed the following UCC Financing Statements in the Maine Secretary of State Office, naming Madawaska Hardscape Products, Inc. as Debtor, in connection with its liens on Debtor's personal property:

   i. UCC-1 filed August 29, 2001, covering all inventory, chattel paper, accounts, equipment, and general intangibles, owned then or in the future, and any replacements or proceeds of same (lapse date is September 7, 2006).

   ii. UCC-3 filed May 8, 2006 (continuation and amendment to reflect change in the Lender's name) (lapse date is September 7, 2011)

   iii. UCC-3 filed May 25, 2011 (continuation) (lapse date is September 7, 2016)

   iv. UCC-1 filed September 7, 2001, covering a 1998 Daewoo G25 Forklift, VIN # 1208676 (lapse date is September 7, 2006)

   v. UCC-3 filed May 8, 2006 (continuation and amendment to reflect change in Lender's name) (lapse date is September 7, 2011)

vi.   UCC-3 filed May 25, 2011 (amendment to reflect change in Lender's name)

vii.   UCC-3 filed May 25, 2011 (continuation) (lapse date is September 7, 2016)

viii.   UCC-1 filed August 21, 2002, covering a 2003 Kenworth T800, VIN # 1NKDXUEX63J706185; a 2002 Moffett Mounty Forklift, Model #M5000, Serial #B22361; and a Taskmaster Truck Body Model TM 24096, Serial # V47069.1 (lapse date is August 21, 2007)

ix.   UCC-3 filed May 8, 2007 (continuation and amendment to reflect change in the Lender's name) (lapse date is August 12, 2012)

x.   UCC-1 filed April 4, 2003, covering all inventory, chattel paper, accounts, equipment, and general intangibles owned then or in the future, and any replacements or proceeds of same (lapse date is April 4, 2008)

xi.   UCC-3 filed January 3, 2008 (continuation and amendment to reflect change in the Lender's name) (lapse date is April 4, 2013)

f.   TD Bank also filed a UCC-1 in the South Carolina Secretary of State Office on July 6, 2009 (lapse date is July 6, 2014), covering "all personal property of Debtor of every kind and nature, wherever located, whether now owned or hereafter acquired," including

7

inventory, equipment, fixtures, accounts, chattel paper, deposit accounts, and proceeds.

g.  Mr. Gerrett testified that TD Bank perfected its security interest in the titled vehicles serving as collateral for its debt by noting its lien on the certificates of title to those vehicles. Debtor's counsel indicated at the hearing that Debtor disputed that TD Bank's liens were reflected on the certificates of title to the vehicles.[4]

5.      On March 29, 2012, TD Bank filed an Emergency Motion for Order Prohibiting Use of Cash Collateral, asserting that Debtor has been operating its business, the marketing and sale of hardscape products, as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108, without an order authorizing the use of cash collateral or TD Bank's consent.

6.      On April 4, 2012, TD Bank filed a Motion for Relief from the Automatic Stay.

7.      Debtor filed an objection to the Emergency Motion for Order Prohibiting Use of Cash Collateral and a Motion for the Use of Cash Collateral on April 5, 2012. In its objection, Debtor asserts that it informed TD Bank of its use of the cash collateral and offered to pay TD Bank interest on the amount owed on a monthly basis to cover any diminution of value. Specifically, Debtor asserts that it offered adequate protection payments of $2,600 on March 23, 2012, which was thirty days after the petition was filed to commence this case. There is no evidence that TD Bank accepted this offer. Instead, it filed its Motion to Prohibit Use of Cash Collateral on March 29, 2012.

---

[4]      Neither party presented the certificates of title or other evidence to clarify this issue. However, the Court finds that the resolution of this issue is not critical to this ruling.

8.      On April 9, 2012, the Court conducted a telephonic hearing on the Emergency Motion for Order Prohibiting Use of Cash Collateral.  At the hearing, the parties announced through counsel that they had reached an agreement resolving all issues related to the cash collateral motions and the stay relief motion. The specific terms of the agreement were announced on the record.  During the hearing, Mr. Albert was present in Debtor's attorney's office and neither he nor Debtor's attorney raised an objection to the terms after they were stated on the record.  The terms of the settlement agreement (the "Agreement") announced on the record were as follows:

a.   Debtor may use Cash Collateral in its ordinary course of business subject to the terms of the settlement.

b.   Debtor is required to make monthly adequate protection payments to TD Bank in the amount of Four Thousand Six Hundred and 00/100 Dollars ($4,600.00) beginning April 15, 2012, and thereafter on the 15th of each month until the termination date.

c.   Debtor is required to provide monthly statements showing inventory and accounts receivable levels on the 15th day of each month until the termination date and is required to maintain the level of its inventory and accounts receivable as reflected in Debtor's schedules as of the Petition Date.

d.   TD Bank is granted a replacement lien on post-petition Cash Collateral in the same validity and priority as its pre-petition lien.

e. TD Bank agreed to not sell at foreclosure that certain real property located at 222 Riverside Street, Portland, Maine and owned by 222 Riverside Corp until after June 1, 2012.

f. The Debtor shall timely pay all taxes due on the Cash Collateral.

g. The Debtor shall maintain insurance on the Cash Collateral in an amount not less than the value of the Cash Collateral.

h. The Agreement will terminate (the date on which the Agreement terminates as provided herein shall be referred to as the "Termination Date") upon the earlier of the following:

    1. The breach or default by either of the parties in performance of any covenant or obligation to perform contained herein; or

    2. Debtor's failure to timely make any payment required under this Agreement; or

    3. The discovery that any representation or warranty made herein was or is untrue, incorrect, or misleading in any material respect; or

    4. The confirmation of a plan of reorganization in this case; or

    5. September 1, 2012.

i. Upon the Termination Date, the parties shall be entitled to enforce their rights under the Loan Documents and applicable law.

j. The Parties agreed that a standard "drop dead" provision would apply.[5]

9. Following the hearing, Debtor refused to consummate the settlement by executing the documents prepared by TD Bank's attorney.

---

[5] A "drop dead" provision allows for relief to be granted upon the filing of an affidavit of default without a further hearing.

10.     On April 13, 2012, the parties advised the Court that a hearing on the Motions was necessary in light of their inability to consummate the settlement. Consequently, the Court issued an order setting a hearing on the Motions for April 24, 2012.

11.     At the hearing on April 24, 2012, Debtor admitted to the use of cash collateral without TD Bank's express consent with respect to its collateral located in Maine.  However, Debtor challenged whether TD Bank's cash collateral interest extended to collateral located in South Carolina.[6]  The Court requested that the parties prepare and submit memoranda of law to further address this issue within 7 days.

12.     Following the hearing and in order to maintain the operations of Debtor while determining the issues raised in the Motions, the Court issued an Interim Order Authorizing the Use of Cash Collateral, which allows Debtor to use cash collateral until further order of the Court and requires Debtor to make adequate protection payments to TD Bank.

13.     According to an exhibit entitled "Madawaska Hardscape Products: Estimated Liquidation Values vs. Estimated Operating Values," which was presented into evidence by Debtor without objection from TD Bank,[7] Debtor's valuation of the personal property claimed by TD Bank is as follows:

| Asset | Estimated Value (Liquidation) | Estimated Value (Operating) |
|---|---|---|
| Cash in Bank | $11,654 | $12,000 |
| Accounts Receivable | $15,000 | $25,000 |

---

[6]     Debtor admitted that some of its assets from its Maine location were commingled with assets from its South Carolina location, including cash on deposit and funds received from sales of inventory and accounts receivable.

[7]     TD Bank does not appear to dispute these values.

| 1998 Utility Flatbed | $5,000 | $5,000 |
|---|---|---|
| 2001 Reitnour Flatbed | $12,000 | $15,000 |
| Princeton B50 Piggyback | $5,000 | $5,000 |
| Teledyne D5000 Piggyback | $12,000 | $15,000 |
| Moffett M5000 | $12,000 | $15,000 |
| Moffett M5000 | $12,000 | $15,000 |
| Yale GLP060 | $5,000 | $7,500 |
| Yale GLP060 | $5,000 | $7,500 |
| Daewoo G30P | $5,000 | $7,500 |
| Daewoo G30P | $5,000 | $7,500 |
| JCB210S | $5,000 | $10,000 |
| Volvo L35B | $20,000 | $40,000 |
| Inventory | $200,000 | $250,000 |
| Misc SC Personal Property | $37,640 | $50,000 |
| Misc ME Personal Property | $9,655 | $20,000 |
| **TOTALS** | $376,949 | $507,000 |

14.     TD Bank presented into evidence the most recent appraisal of the Maine

Location owned by 222 Riverside Corp., which shows a value of $430,000 as of February

23, 2012.   Debtor asserts that the equity in the Maine Location, which secures the

guaranty of 222 Riverside Corp., is additional adequate protection for TD Bank's

interests.   Debtor asserts that the Maine Location has a value of $600,000, based on TD

Bank's prior appraisal that was conducted on May 20, 2011, but did not offer evidence to

dispute the valuation provided by TD Bank's more recent appraisal. Therefore, to the

extent relevant, the Court finds the value of the Maine Location to be $430,000.00.

## CONCLUSIONS OF LAW

In connection with the Motions before the Court, the parties have presented three

primary issues for the Court's consideration: 1) the extent of TD Bank's security interest

in Debtor's property; 2) whether TD Bank is entitled to relief in the form of adequate

protection or an order granting relief from the automatic stay; and 3) whether the Court

should authorize or prohibit Debtor's use of cash collateral.

## I.      The Extent of TD Bank's Security Interest in Debtor's Collateral

In its Emergency Motion to Prohibit Use of Cash Collateral, TD Bank requests an

order prohibiting Debtor from using its cash collateral on the grounds that it holds a valid

and perfected security interest in the property of Debtor, including Cash Collateral, and

that Debtor has used its Cash Collateral without its consent and without obtaining

authorization by court order in violation of 11 U.S.C. § 363(c)(2).[8]  Debtor objects to the

motion, disputing that TD Bank has a duly perfected first priority lien on all of Debtor's

Cash Collateral.  Specifically, Debtor argues that the Cash Collateral encumbered by TD

Bank's Security Agreement is limited to the collateral located in the State of Maine.[9]

a.      Governing Law

The resolution of the issue of whether TD Bank has an enforceable security

interest in Debtor's collateral located in South Carolina is governed by Maine law, since

Debtor is a corporation organized and existing under the laws of the State of Maine.[10]

---

[8]        Further references to the Bankruptcy Code shall be by section number only.
[9]        While there was some reference to the absence of lien notation on certain titled vehicles, no titles
were presented to the Court.
[10]       The Security Agreement also provides that it is governed by Maine law.

See S.C. Code Ann. § 36-9-301 ("Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral"); see also S.C. Code Ann § 36-9-307 (providing that a "registered organization that is organized under the law of a State is located in that State").

      b.      Debtor's Collateral in South Carolina

The parties do not dispute the adequacy of the Security Agreement, its amendments, or the financing statements filed in Maine in order to perfect TD Bank's security interest in the collateral. The parties agree that TD Bank has a properly perfected security interest in Debtor's collateral located in Maine according to Maine's version of the Uniform Commercial Code.  See 11 M.R.S.A. § 9-1308 (providing that "a security interest is perfected if it has attached and all of the applicable requirements for perfection in sections 9-1310 to 9-1316 have been satisfied"); 11 M.R.S.A. § 9-1310 (requiring the filing of a financing statement in order to perfect a security interest). The parties' dispute is regarding whether TD Bank's security interest also extends to Debtor's collateral located in South Carolina, which turns on whether the language of the security agreement adequately describes that collateral. 11 M.R.S.A. § 9-1203 provides in applicable part that:

    [A] security interest is enforceable against the debtor and 3rd parties with respect to the collateral if:

    (a) Value has been given;

    (b) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

> (c) ... (i) The debtor has authenticated a security agreement that provides a description of the collateral....

Under 11 M.R.S.A. § 9-1108(a), "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described."  Debtor  argues that the Security Agreement does not sufficiently identify the property located in South Carolina since Exhibit B of the security agreement specifically limits the collateral serving as security for TD Bank's loan to the property located in Maine.

When examining a security agreement to determine the extent of a security interest, the Court engages in a two-part inquiry: "(1) Can the written description reasonably be construed to include the disputed property; and (2) Did the parties intend that the description include the disputed property?"  In re Shop-N-Go of Maine, Inc., 38 B.R. 731, 734 (D. Maine 1984); see also 4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 31-1 (5th ed. 2002) (stating that if the claimed property arguably fits within the broadest possible reading of the descriptive language, the court should uphold it as formally sufficient under 9-203 and turn to the factual question of what the parties actually intended); see generally, Orix Credit Alliance, Inc. v. Virginia, N.A., No. 93-1193, 1993 WL 492907 (4th Cir. Nov. 30, 1992) (stating that the extent of a security interest is determined by looking at the totality of the language in the document to determine the parties' intent) (citing United Virginia Bank v. B.F. Saul Real Estate Invest. Trust, 41 F.2d 185, 189 (4th Cir. 1981)); In re S.M. Acquisition Co., 296 B.R. 452, 465 (Bankr. N.D.Ill. 2003).

    *1.*    *Language of the Security Agreement*

Paragraph 1 of the Security Agreement entered into between Debtor and TD Bank

provides the description of the collateral serving as security for TD Bank's loan to

Debtor.  It states:

> Debtor hereby grants to [TD Bank] a present and continuing security
> interest in and valid lien on all of the Debtor's property described in
> Exhibit A attached hereto, together with any and all additions and
> accessions thereto, replacements, proceeds ... and products thereof, and
> substitutions therefor, ***wherever the same may be located*** and whether
> now existing or hereafter arising or acquired (hereinafter referred to
> collectively as the "Collateral"). (emphasis added)

Exhibit A provides a detailed description of the items serving as Collateral, including:

> (a) All of Debtor's goods, accounts, instruments, chattel paper, documents,
> investment property, commercial tort claims, letter of credit rights, general
> intangibles, deposit accounts and money..., including (b) all of Debtor's
> equipment... whether now owned or hereafter acquired ***and wherever
> located***, ... (c) all of Debtor's inventory, whether now owned or hereafter
> acquired..., and (d) any and all of Debtor's rights to payments for goods
> sold or leased or for services rendered...; and (e) all of Debtor's other
> tangible or intangible personal property of every type or nature not
> described above....  (emphasis added)

Exhibit B is referenced in Paragraph 3 of the Security Agreement, which is the "Special

Representations, Warranties and Covenants of Debtor" section of the Agreement.  This

section provides that "Debtor hereby warrants and covenants to the Secured Party that:

...The chief executive office of Debtor and all of Debtor's additional places of business, if

any, and the location of all the Collateral are listed in Exhibit B attached hereto."  Exhibit

B provides that the Debtor's Chief Executive Office is located at 222 Riverside Street,

Portland, Maine, and the location of all Collateral is 222 Riverside Street, Portland,

Maine.

The Court finds the description of the Collateral required under 11 M.R.S.A. § 9-1203 is set forth in Paragraph 1 of the Security Agreement, and that neither the description contained in this paragraph nor the more detailed collateral description provided in Exhibit A limits the Collateral described by location.  The parties' inclusion of the language "wherever the same may be located" and "wherever located" in the collateral descriptions provided in Paragraph 1 and Exhibit A reasonably identifies collateral located at all of Debtor's places of business.  Paragraph 3, together with Exhibit B, merely provides for certain representations and warranties of Debtor, including Debtor's warranty that, at the time of the execution of the Security Agreement, the Collateral is located at the Maine location.  Viewing the Security Agreement as a whole, it does not appear that Exhibit B was intended to further define the Collateral and limit it to only those assets located in Maine. See In re S.M. Acquisition Co., 296 B.R. 452, 465 (Bankr. N.D. Ill. 2003) (finding that a reference to a specific location of the property contained in the borrower's covenants section of the security agreement did not alter the express provision of the contract that described the collateral as "all of Borrower's tangible and intangible assets and property, whether now or hereafter existing and whether now or hereafter owned," which the court found gave the bank a security interest in all of the debtor's existing and after acquired property without reference to any specific location).

## 2.  Intent of the Parties

TD Bank's witness testified that the parties intended for the Security Agreement to encumber all assets of Debtor, including those subsequently acquired by Debtor, wherever located. He also testified that the inventory reports historically submitted by

Debtor to TD Bank included South Carolina inventory and other assets. While Debtor testified that the funds used to open the South Carolina location came from other businesses owned by Debtor, no documents or other evidence were offered to corroborate this testimony. Debtor's credit line with TD Bank was substantially increased several times following the opening of the South Carolina location, and it appears from Debtor's own testimony that the funds from these loan advances and the proceeds from the sale of inventory purchased with such loan advances were used for the business operations of both locations of Debtor.

### 3.  Applicable Law

In the factually similar case of U-Lane-O Federal Credit Union v. Little Puffer Billy, Inc. (In re Little Puffer Billy, Inc.), the bankruptcy court considered whether a security agreement describing collateral as "all inventory of [the debtor], Valley River Center, Eugene, Oregon," also included inventory from the debtor's subsequently opened store in another location. 16 B.R. 174, 175 (Bankr. D. Or. 1981)). Even though the description of inventory identified a specific location where that inventory was located, the court concluded that the inventory encumbered was that of the debtor, unlimited as to location. The court noted that "[o]nly the debtors were in a position to know whether or not additional stores were contemplated when the loans were obtained, and in a position to limit the encumbrance to inventory at a specific location." The court also observed that inventory is a "continuing concept" and it is unnecessary to set forth the address where collateral is to be located when it is obvious or readily inferable that the type of collateral covered would naturally be located in those places where the debtor does business. Id.  (citing In re Little Brick Shirthouse, Inc., 347 F.Supp. 827 (N.D. Ill. 1972)).

Debtor cites several cases in support of its argument that TD Bank's collateral should be limited to the assets located at the address identified in the Security Agreement: In re Freeman, 33 B.R. 234 (Bankr. C.D. Cal. 1983) (finding that a security agreement that described the collateral as all furniture and fixtures and inventory of the debtor now or at any time located or installed on the land or in the improvements at a specified address did not create a security interest in similar items when the debtor moved to a new location); In re Matter of California Pump and Mfg. Co., 588 F.2d 717, 719 (9th Cir. 1978) (finding that a security agreement that described the collateral as all of the furniture, fixtures, leasehold improvements, inventory, and accounts receivable... located at a specified address did not create a security interest in similar items at other locations of debtor); In re Tepper Indus., 74 B.R. 713 (B.A.P. 9th Cir.1987) (finding that a security agreement that described the collateral as the furniture, fixtures, equipment, accounts, contract rights, leasehold, inventory, proceeds of the same  or similar type hereafter acquired by the debtor located at a specified address did not create a security interest in similar items when the debtor moved to a new location); and First Nat'l Bank of Glasgow v. First Sec. Bank of Montana, N.A., 721 P.2d 1270 (1986) (finding that a security agreement that described the collateral as certain numbers of livestock and also stated that all livestock covered by the agreement "are or will be located at 20 miles east of Jordan on premises owned by: James J. Murnion" did not create a security interest in livestock in another county).[11] The Court finds that these cases are distinguishable from

---

[11] Debtor also cited In re Granny Frannies, Inc., 39 B.R. 377 (Bankr. D.S.C. 1984), which appears to be inapplicable since it addresses the separate issue of whether a properly perfected security interest continues in collateral once the collateral has been transferred to another location.  The court concluded that when a creditor has perfected its security interest by properly filing a financing statement and the debtor, without the creditor's consent, removes the collateral from its original location or transfers title to the collateral, the creditor's perfected security interest continues.  This issue does not appear to have been raised by the parties in this case.

the instant case because each of the security agreements at issue in these cases contained

a section describing the encumbered collateral that specifically limited the security

interest to the property at a specific location and, unlike this case, none of the security

agreements included "wherever located" language in its description of the collateral.

*4.  TD Bank's Security Interest Extends to South Carolina Collateral*

Based on the totality of the language in the Security Agreement, the Court finds

that the parties intended to create a security interest in Debtor's property, wherever

located, and that Exhibit B should not be interpreted to limit the Collateral to Debtor's

property at its Maine Location.

**II.    Relief for TD Bank under 11 U.S.C. § 362(d)**

TD Bank asserts that the Court should grant relief from the automatic stay under

§§ 362(d)(1) and (d)(2) to allow it to pursue its state law remedies against its collateral.

These sections provide that:

> On request of a party in interest and after notice and a hearing, the court
> shall grant relief from the stay provided under subsection (a) of this
> section, such as by terminating, annulling, modifying, or conditioning
> such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in
>     property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of
>     this section, if—
>
>     (A) the debtor does not have an equity in such property; and
>     (B) such property is not necessary to an effective reorganization.

TD Bank argues that cause exists for relief from the automatic stay based upon

the lack of adequate protection, lack of post-petition payments, and Debtor's

unauthorized use of cash collateral.  The evidence indicates that, up until the entry of the

Interim Cash Collateral Order requiring Debtor to make adequate protection payments to TD Bank, Debtor used and liquidated TD Bank's collateral without authorization and without making post-petition payments.  TD Bank's witness testified that Debtor had failed to make payments on its loan with TD Bank for two years. Debtor's Business Income and Expenses Statement filed on March 5, 2012, indicated a budget shortfall of $15,582.00.  Debtor filed an amended Business Income and Expenses Statement on April 4, 2012, which indicated a positive cash flow of $3,150.00.   The Amended Statement shows an increase in estimated average future gross monthly income of $50,000.00.  This increase in income was not adequately explained by Debtor at the hearing and the Court is not convinced by the evidence presented that the Amended Statement is an accurate representation of Debtor's finances. Rather, the testimony presented at the hearing paints a picture of a debtor struggling to survive.  Debtor has been operating its business out of two parcels of real property, owned by separate, non-debtor entities, without paying its rent for several months.[12]   Both the Maine and South Carolina Locations are in foreclosure and thus at risk of being closed once a foreclosure sale has been completed. Debtor presented no evidence that it has been able to obtain debtor-in-possession financing and has offered no convincing evidence of a change in factors showing an improved ability to operate effectively.

The Court has "broad discretion to determine what constitutes 'cause' sufficient to warrant relief from stay." In re Breibart, No. 03–07440–W, slip op. at 2 (Bankr. D.S.C. Feb. 17, 2004) (citations omitted).   This decision is made on a case by case basis. Robbins v. Robbins (In re Robbins), 964 F.2d 342, 345 (4th Cir. 1992) (stating that

---

[12]      Mr. Albert testified that Debtor had not made its lease payments on either property in the three months prior to the hearing. Debtor's statement of financial affairs indicates that no lease payments have been made on the South Carolina Location since February of 2011.

"[b]ecause the Code provides no definition of what constitutes 'cause,' courts must determine when discretionary relief is appropriate on a case-by-case basis").  Under the circumstances of this case, the Court agrees with TD Bank's assertion that cause exists to grant relief from the automatic stay, and concludes as follows:[13]

Madawaska Loan

The Madawaska Loan is guaranteed by three non-debtor parties, including 222 Riverside Corp., which has given TD Bank a junior mortgage on the 222 Riverside Location to secure the guaranty.  The automatic stay in this case does not apply to stay action against non-debtor guarantors or non-debtor property.  See Credit Alliance Corp. v. Williams, 851 F.2d 119, 121 (4th Cir. 1988) (finding that the automatic stay does not protect the property of non-bankrupt guarantors of a debtor proceeding under Chapter 11).  Therefore, TD Bank may take action against non-debtor guarantors, including 222 Riverside Corp, and foreclose on the junior mortgage given on its non-debtor property.  To the extent necessary, the Court grants relief from stay for cause to allow TD Bank to name and act against Debtor to liquidate the debt or as otherwise necessary to successfully prosecute the guaranty and foreclose on the 222 Riverside Location.  This relief includes charging reasonable attorneys fees and costs incurred as a result of these proceedings, based upon Debtor's use of that property while asserting TD Bank's oversecured status, as long as those fees and costs are collected from non-debtor collateral.  However, the Court will conditionally deny TD Bank's Motion for Relief from the Automatic Stay and not allow the recovery of Debtor's personal property,

---

[13]     In light of the Court's conclusion that cause exists for relief from stay under § 362(d)(1), the Court finds it unnecessary to consider whether relief should be granted under § 362(d)(2) at this time.

including Cash Collateral, at this time upon the requirement that Debtor provide adequate protection to TD Bank as set forth below.

222 Riverside Loan

Separately, Debtor has guaranteed a loan by TD Bank to 222 Riverside Corp., a non-debtor, which is secured by a mortgage on non-debtor property (the 222 Riverside Location).  Again, TD Bank is not stayed from pursuing its action against the non-debtor, 222 Riverside Corp. and the non-debtor property.  In relation to that action, for cause shown, the Court will grant relief from stay in order to allow TD Bank to sue Debtor on its guaranty of that debt and obtain judgment in order to liquidate its debt or otherwise proceed as necessary to collect against 222 Riverside Corp. or the 222 Riverside Location.  However, TD Bank shall not collect or sell property of Debtor's estate without further order of the Court.

### III.     Should Debtor's Use of Cash Collateral be Authorized or Prohibited?

In light of the Court's finding that TD Bank has a security interest in Debtor's assets located in both Maine and South Carolina, as discussed above, the evidence shows that TD Bank's collateral includes cash collateral pursuant to § 363 and that until the entry of the Interim Order on April 26, 2012, Debtor used cash collateral in both Maine and South Carolina without obtaining the consent of TD Bank or an order authorizing such use in violation of § 363(c)(2).[14]  Section 363(c)(2) provides that a debtor in possession "may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing authorizes such use, sale, or lease in accordance

---

[14]     Debtor's testimony indicated that funds from sales of inventory in both locations were commingled in its bank accounts .

with the provisions of this section." Debtor argues that the Bank knew it was using cash collateral and it made an offer of adequate protection payments to TD Bank, which was not accepted. It further argues that its use of cash collateral was necessary to avoid immediate and irreparable harm to Debtor.

a.    Debtor's Use of Cash Collateral was Improper

The Court finds that Debtor's use of cash collateral prior to the Order issued on April 26, 2012 was improper. A debtor's offer of adequate protection for the use of cash collateral without the express consent of the creditor is not sufficient to meet the requirements of § 363(c)(2). See Freightliner Mkt. Dev. Corp v. Silver Wheel Freightlines, Inc., 823 F.2d 362, 368 (9th Cir. 1987) (finding that "the purposes underlying § 363(c)(2) & (4) require that a debtor seek affirmative *express* consent from all parties involved before using cash collateral" and that implied consent is insufficient to satisfy the requirements of § 363(c)(2)); In re CHA Hawaii, LLC, 426 B.R. 828, 837 (Bankr. D. Hawaii 2010) (stating that there is a firmly established rule that the creditor's consent to the use of cash collateral must be express, not implied) (citing Freightliner); In re Three Partners, Inc., 199 B.R. 230, 237 (Bankr. D. Mass. 1995 (stating that the failure of a secured creditor to object to the unauthorized use of cash collateral is not tantamount to that creditor's consent to the use of cash collateral). The Court also notes that Debtor waited until after the filing of both TD Bank's Motion to Prohibit Use of Cash Collateral and its Motion for Relief from Stay to file a Motion to Use Cash Collateral. The use of cash collateral without court authorization or the creditor's consent can have harsh consequences, including the dismissal of the case or the granting of relief from the automatic stay. In re Vick Enterprises, Inc., C/A No. 89-03173, slip op. (Bankr. D.S.C.

Nov. 21, 1991) (stating that the penalties for the unauthorized use of cash collateral can be particularly harsh and include, *inter alia,* the award of a replacement lien, appointment of a trustee, sanctions, denial of confirmation and dismissal of case); see also In re City Loft Hotel, LLC, 465 B.R. 428, 435 (Bankr. D.S.C. 2012) (finding cause for relief from stay under § 362(d)(1) based on debtor's unauthorized use of cash collateral, among other grounds).

b.    Debtor Must Provide Adequate Protection to TD Bank

Debtor argues that TD Bank is adequately protected by the equity in the cash collateral and the guaranties serving as additional security for its loans. The evidence presented, however, indicates that TD Bank's debt exceeds the value of Debtor's property which serves as collateral to secure that debt. Therefore, the Court finds that TD Bank has met its burden of demonstrating a lack of adequate protection since there is no equity in the personal property serving as Cash Collateral and because the evidence indicates that the continued use of Cash Collateral diminishes its value, which is harmful to TD Bank. While at this early stage of the case, it appears Debtor's ability to use Cash Collateral is necessary to preserve a chance for reorganization, a serious question has been raised regarding Debtor's ability to succeed and generate replacement collateral to protect TD Bank due to Debtor's history of failing to make payments to TD Bank, its use of Cash Collateral without authorization, the probable loss of its business locations, and its failure to make necessary lease payments, among other things. Therefore, it appears that TD Bank is not adequately protected unless it receives payments, equity or other means of protection of its interest.

25

Under such circumstances, Debtor bears the burden of demonstrating the existence of adequate protection. See In re Neals, 459 B.R. 612, 619 (Bankr. D.S.C. 2011). To that end, Debtor argues that TD Bank is adequately protected by the guaranties on its loans, particularly the 222 Riverside Corp. guaranty. No evidence was offered regarding the financial strength of guarantors Daniel Albert or Keystone Northeast, Inc. Debtor argues that there is equity in the Maine real property that collateralizes the guaranty given by 222 Riverside Corp., a non-debtor entity, which serves to adequately protect TD Bank's interests. However, the collateral serving as security for 222 Riverside Corp.'s guaranty is not property of Debtor. When evaluating whether a third party guaranty is a suitable form of adequate protection, courts have focused on "the financial strength of the guaranty." Lombardo's Ravioli Kitchen, Inc., No. 08-20774, 2009 WL 585814, at *1 (Bankr. D.Conn. Feb. 20, 2009); see also In re Swedeland Development Group, Inc., 16 F.3d 552, 564 n. 14 (3d Cir. 1994) ("The sufficiency of [a third-party guaranty] would depend, *inter alia,* on the financial strength of the guarantor."); In re Carolina Utilities Supply Company, Inc., 118 B.R. 412 (Bankr. D.S.C. 1990) (unsecured guaranty did not constitute adequate protection where there was no evidence in the record about the guarantor's financial condition). In the instant matter, the Court finds that the financial strength of the 222 Riverside Corp.'s guaranty is uncertain, considering that the mortgage securing the guaranty is junior in priority to at least one senior mortgage, the real property securing the mortgage is the subject of a foreclosure action, and no evidence was presented regarding the financial condition of 222 Riverside Corp. Therefore, the Court concludes that Debtor has not met its burden of proving that the collateralized guaranty can be viewed as a means of adequate protection.

Based on the foregoing, the Court concludes that Debtor must provide other adequate protection to TD Bank.  Prior to the hearing on TD Bank's Motion to Prohibit Use of Cash Collateral on April 9, 2012, the parties agreed to a sum for adequate protection payments to TD Bank and reiterated the agreement at the hearing on April 24, 2012 for the interim order.  They also agreed, among other things, to maintain insurance and pay taxes on the personal property and to provide a replacement lien to TD Bank.  Therefore, the Court adopts that amount and those terms and finds them reasonable and appropriate under the circumstances of this case.[15]   Under these terms and conditions, which are set forth in more detail below, the Court denies TD Bank's Motion to Prohibit Use of Cash Collateral at this time and conditionally grants Debtor's Motion to Use Cash Collateral.

## CONCLUSION

Based on the foregoing, it is hereby ORDERED:

1. The automatic stay in this case is not applicable to any action to collect by TD Bank against 222 Riverside Corp, Daniel B. Albert, or Keystone Northeast, Inc., and any collateral pledged to secure loans obtained by them from TD Bank or guaranties given to TD Bank (other than the personal property of Debtor).

2. To the extent necessary, TD Bank's Motion for Relief from the Automatic Stay is granted for cause in order to allow it to pursue and obtain judgment in state court on its collateral and Debtor's guaranty serving as security for

---

[15]   This Court has previously bound parties to a settlement agreement announced on the record and has entered judgment based upon that agreement.  See Willis v. Southeastern Steel Co. (In re Southeastern Steel Co.), C/A No. 00-09225-W, Adv. Pro. No. 01-80295 (Bankr. D.S.C. Jul. 9, 2002).

the 222 Riverside Loan, except that TD Bank shall not collect or sell property of Debtor's estate without further order.

3.  The automatic stay is not applicable to any action of TD Bank to collect against 222 Riverside Inc.'s guaranty and collateral pledged by it with respect to the Madawaska Loan.  TD Bank is not prohibited from attempting collection from the other guarantors under the Madawaska Loan and/or the 222 Riverside Loan or pursuing state law remedies against non-debtor collateral, including charging reasonable attorneys fees and costs incurred as a result of these proceedings, based upon Debtor's use of that property while asserting TD Bank's oversecured status, as long as those fees and costs are collected from non-debtor collateral.[16]

4.  Debtor may use the Cash Collateral only in the ordinary course of its business and subject to the provisions of this Order until further order of the Court.

5.  Debtor shall make monthly adequate protection payments to TD Bank in the amount of Four Thousand Six Hundred and 00/100 Dollars ($4,600.00) beginning June 27, 2012, and thereafter on the 27th of each month until further order of the Court.[17]  TD Bank shall apply Two Thousand Six Hundred and 00/100 Dollars ($2,600.00) of said payments to interest and Two Thousand and 00/100 Dollars ($2,000.00) to principal on the

---

[16]     To the extent the automatic stay can be said to apply, the Motion for Relief is granted.
[17]     Debtor's obligation to pay TD Bank for the time prior to the issuance of this Order and to provide computer generated monthly operating reports to TD Bank is addressed by the Interim Order entered on April 26, 2012.

Madawaska Loan.  Any payment not received by TD Bank within 10 days

from its due date shall be considered late and a violation of this Order.

6.  Debtor shall maintain the level of its inventory and accounts receivable as

reflected in the Debtor's schedules as of the Petition Date.

7.  Debtor shall timely pay all taxes due on the Collateral.

8.  Debtor shall maintain insurance on the Collateral in an amount not less than

the value of the Collateral.

9.  Debtor shall provide computer generated monthly operating reports to TD

Bank showing current and accurate levels of all Collateral, as well as proof

of payment of all necessary taxes and insurance and lease payments on the

business premises, on June 27, 2012, and thereafter on the 27th of each

month with regard to the preceding month.

10. TD Bank is granted a replacement lien on post-petition Collateral in the

same validity and priority as its pre-petition lien.

11. In the event Debtor fails to comply with the provisions of this Order, upon

an *ex parte* showing by affidavit and a proposed order, TD Bank shall be

entitled to further relief from the stay so that it can proceed with its state

court remedies against all of its security, including making demand for

payment of the amount due.  If Debtor makes or TD Bank receives any

payment after the 10-day drop dead provision, it will not cure the default

and TD Bank will be entitled to an order granting it relief from stay.  TD

Bank shall report to this Court any funds received as a result of a lawful

29

disposition of the Collateral in excess of its total indebtedness plus any other

valid lien against the Collateral.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**06/08/2012**



Chief US Bankruptcy Judge
District of South Carolina

Entered: 06/08/2012